In re RAY BROOKS MACHINERY
COMPANY, INC., Debtor.

BUCYRUS CONSTRUCTION
PRODUCTS, INC.,
Appellant,

v.

Tom McGREGOR, Trustee; and Ray
Brooks Machinery Company,
Inc., Appellees.

Bankruptcy No. 86–00528–APG.

United States Bankruptcy Court,
M.D. Alabama, N.D.

April 11, 1989.

Barry E. Teague, Montgomery, Ala., for Trustee.

Charles N. Parnell, III, Wood & Parnell, Montgomery, Ala., for Northwest Engineering Co.

## DECISION AFTER REMAND ON TRUSTEE'S MOTION TO CLASSIFY CLAIMS

A. POPE GORDON, Bankruptcy Judge.

A hearing on the trustee's objection to the claim filed in this case by Bucyrus Construction Products, Division of Northwest Engineering Company was held February 28, 1989. This is the second such hearing. The classification of the claim by this court after the first hearing was appealed to the District court.

The District court vacated the order of this court classifying the claim under 11 U.S.C. § 726(a)(3) in the third priority for distribution and remanded the matter for further proceedings.

The District court requires this court to make findings of fact with respect to whether the creditor had *notice* of this case in time to file a proof of claim by July 17, 1986, which was the bar date fixed for creditors to file proofs of claim in this case.

The court concludes, based on findings that follow, that the claim must be allowed as an unsecured, tardily filed claim and paid with claims in the third priority.

## FINDINGS

The entity that extended credit to the debtor and filed the claim contested here is a corporation named "Northwest Engineering Company" (Northwest). In 1978 Northwest took over Bucyrus Products Construction (Bucyrus) and immediately merged the business into its operations at Green Bay, Wisconsin.

The Bucyrus plant was located in Erie, Pennsylvania. Northwest continued to manufacture Bucyrus products at Erie. The sales force for these products worked out of Erie. Some administrative activities such as cost accounting also remained at Erie. The rest of the operation was transferred to the Northwest offices in Green Bay, where the central computer was locat-

ed. Northwest paid salaries and other bills from Green Bay, and handled financing of credit sales, collections, and customer billing from that location.

After Northwest acquired Bucyrus, Bucyrus ceased to exist as a separate entity and became a part of Northwest. At the time of bankruptcy, according to undisputed testimony and answers to interrogatories, Bucyrus was not a corporation. Contrary to statements in briefs and pleadings of the creditor, there was no entity named "Bucyrus Products Construction, *Inc.*" [1]

Dave Forsman, a credit manager for Northwest, assumed the duties of credit manager for Bucyrus credit sales and collections "to get that organized and operating." For two years these were his main duties. He often commuted to Erie, but spent most of his time in Green Bay. After the bankruptcy, he was promoted to corporate credit manager for Northwest. During all of this time his salary was paid by Northwest and his main office remained at Green Bay.

Apparently as a result of financial arrangements involving Bucyrus, Northwest gave the Bank of New England a security interest in accounts receivable generated from the sale of Bucyrus products. Customers were directed, on the face of invoices (including the ones to the debtor in evidence), to remit payments to Post Office Box 6060, Boston, MA 02212–6060. The Bank arranged to intercept these payments to apply on the Northwest indebtedness. The Bank was instructed, however, to forward any other documents received at that address, including bankruptcy notices, to Northwest. The Boston address was one of the addresses the debtor listed in the matrix and schedule of creditors filed with the bankruptcy petition.

Northwest did business sometimes as "Bucyrus Construction Products, Division of Northwest Engineering Company" and sometimes simply as "Bucyrus Construction Products." The creditor was organized to receive mail from customers under these names at three locations:

P.O. Box 1009

Green Bay, Wisconsin 54305

Post Office Box 800

Erie, Pennsylvania 16512

P.O. Box 6060

Boston, MA 02212–6060

The Bank of New England and Northwest employees at Erie and Green Bay were directed to route all bankruptcy notices to the credit manager Forsman at either Green Bay or Erie. According to Forsman, overnight mail by Federal Express or Purolator between these cities was an everyday affair. Some difficulty was encountered, however, in the Bank's handling of notices going from Boston to Green Bay or Erie.

In August 1985 under the name "Bucyrus Construction Products Division of Northwest Engineering Company" (as the name appears on the UCC–1 financing statement in evidence), Northwest extended credit to the debtor and took a security interest in certain inventory and repair parts of the debtor. Forsman approved the credit. He executed the UCC–1 financing statement for the creditor as the secured party. The address of the secured party shown on the statement is the Green Bay address, one of the addresses listed by the debtor in the schedule of creditors and the matrix filed with the bankruptcy petition.

After the indebtedness became delinquent, Forsman corresponded with John Brooks, the principal stockholder of the debtor corporation, almost up until bankruptcy. According to Forsman, "Numerous letters flowed back and forth." About 75 percent of the time, Brooks mailed letters to and received mail from the Green Bay office. Forsman did not deny receiv-

---

**1.** Counsel for the creditor states in brief, "Bucyrus Construction Products, Inc., was a subsidiary of Northwest Engineering Company, Inc. It was a parent-subsidiary relationship where Bucyrus Construction Products, Inc. operated on its own and had its own totally separate existence." Brief in Support of Motion for Summary Judgment, at 1 (filed by counsel for the creditor October 19, 1988). Throughout these proceedings, including the appeal, counsel for the creditor has signed pleadings and briefs as "Attorney for Bucyrus Construction Products, Inc." This is misleading.

ing letters from Brooks mailed to Green Bay.

Not satisfied with the results of the correspondence with Brooks, Forsman visited the debtor's place of business in Montgomery a few days before bankruptcy to discuss the delinquent indebtedness. He found the place closed for business.

On March 12, 1986, one week after the bankruptcy petition was filed, the trustee, in performing his duties, wrote a letter to the creditor,[2] advising the creditor of the bankruptcy and requesting assistance in disposing of the inventory in which the creditor had a security interest. The trustee mailed the letter to Green Bay using the address provided by the debtor in Schedule A–2 of the bankruptcy petition. The envelope containing the letter was not returned to the trustee by the postal service. Forsman did not deny receiving the letter. Sometime in early April 1986, Forsman employed local counsel. The local attorney handling the case got in touch with the trustee regarding problems in disposing of the inventory. This was over 90 days before the bar date for filing claims. After that, for more than 90 days the attorney and the trustee remained in constant communication about this case.

On March 25, 1986, a Deputy Clerk of court mailed all creditors a copy of the court order fixing July 17, 1986, as the last date for creditors to file proofs of claims in this case. Two of the envelopes were addressed as follows:

Bucyrus Construction Prod.
Post Office Box 1009
Green Bay, WI 54305
Bucyrus Construction Products
Box 6060
Boston, Massachusetts 02212

These addresses were photocopied from the matrix prepared by the debtor and filed with the bankruptcy petition in this case. The Clerk certified such mailing on the face of the court order. A proof of claim form accompanying the order was partially completed to show the case name and number and the return address of the Clerk of Court.

Government envelopes bearing the printed return address of the Clerk were used. The postal service did not return either one of the envelopes as undelivered.

According to Forsman, he did not remember receiving either notice. Company procedure is to keep a copy of a bankruptcy notice in the customer file. The original notice is sent to the company attorney for handling. Forsman testified he searched the company file on the debtor sometime prior to leaving the company in September 1988 and did not find a copy there. The attorney for the creditor stated that Forsman never gave him a copy of the notice. In an answer to interrogatories for the creditor, James J. Ward, who is otherwise unidentified, made the bare response to the question whether Northwest received notice, "no record of receiving notice." Ward did not testify.

Forsman and the attorney for the creditor first appeared in this case at the first meeting of creditors held April 18, 1986, pursuant to 11 U.S.C. § 341(a). This was 90 days before the last day set by Bankruptcy Rule 3002(c) for filing claims. Bankruptcy Rule 3002(c) provides, with exceptions not applicable here, that in a Chapter 7 liquidation case "a proof of claim shall be filed within 90 days after the first date set for the meeting of creditors called pursuant to § 341(a) of the Code ..."

On May 21, 1986, almost two months before the July 17 bar date for filing claims, Northwest issued a $10,547 credit memorandum to the trustee under the name "Bucyrus Construction Products." Later the credit memorandum was mailed to the trustee with a cover letter dated July 7, 1987, and signed by Northwest. No explanation was offered for the apparent delay of over one year in forwarding the credit memorandum.

### CONCLUSIONS

This is a Chapter 7 liquidation case in which funds are to be distributed. The

---

**2.** The letter did not mention the bar date for filing claims. It was written before the court

order of March 25, 1986, setting the bar date.

matters presently before the court affect this distribution.

In distributing the funds of a bankruptcy estate (some $450,000 in this case), the provisions of 11 U.S.C. § 726 must be followed. Section 726(a) establishes six priorities for such distribution. Because the claim of this creditor was tardily filed, the question presented here is whether the creditor should receive distribution under the second priority specified in subsection (a)(2)(C) or under the third priority specified in subsection (a)(3).[3] The third priority is subordinate to the second priority. Section 726 states:

> (a) ... [P]roperty of the estate shall be distributed—
>
> (1) *first*, ...
>
> (2) *second*, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is—
>
> (C) tardily filed under section 501(a)[4] of this title, *if*—
>
> (i) *the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim* under section 501(a) of this title; and
>
> (ii) proof of such claim is filed in time to permit payment of such claim;
>
> (3) *third*, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection; ...

(Emphasis added.)

The claim of Northwest will be allowed as unsecured in the amount of $145,231.29. But, because the court finds that Northwest had "notice or actual knowledge of the case in time for timely filing a proof of ... claim" and tardily filed its proof of claim, funds of the estate cannot be distributed to Northwest under the second priority (subsection (a)(2)(C)). Instead, the claim must be paid pro rata among claims in the third priority (subsection (a)(3)), as provided by section 726(b) which states:

> Payments on claims of a kind specified in ... [paragraph (3) ] of subsection (a) of this section [section 726], shall be made pro rata among claims of the kind specified in each particular paragraph ...

### Notice

In deciding whether the creditor had notice of this case in time for timely filing a proof of claim, the questions presented are: (1) whether the official court notice was properly addressed; (2) if so, whether the creditor received it; and (3) if not, whether the creditor otherwise had sufficient notice of this case in time to file a timely claim.

1

In response to the question whether the court notice was properly addressed, counsel for the creditor argues that the only correct address was the one at Erie. That argument runs counter to the testimony of the credit manager:

> Q: Now, if in 1986 one wanted to mail something to Dave Forsman, your proper address was P.O. Box 1009, Green Bay, Wisconsin, was it not?
>
> A. Either that or the address in Erie.
>
> Q. Well, are you saying that—
>
> A. It was six of one and half dozen of the other.

And later:

> Q. That [Bucyrus Construction Products at Box 6060, Boston, Massachusetts] would have been a proper address, too, would it not?
>
> A. Normally, yes.

The argument continues that, because the notice was addressed to Bucyrus using the Northwest address in Green Bay, instead of to Bucyrus in Erie, the notice was misaddressed and, therefore, the trustee

---

**3.** At this point in administration of the estate, it appears that, after distribution under the second priority, distribution to creditors filing tardy claims will be possible under the third priority. Twelve creditors, including Northwest, filed tardy claims payable under subsection (a)(3).

**4.** 11 U.S.C. § 501. Filing proofs of claims or interests.

 (a) A creditor or an indenture trustee may file a proof of claim. An equity security holder may file a proof of interest.

 ...

cannot have the benefit of the presumption that a properly addressed and mailed notice was received. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dodd (In re Dodd)*, 82 B.R. 924 (N.D.Ill.1987) ("The law presumes that a properly mailed item was received by the addressee ... The presumption arises upon proof that the addressor properly addressed the item.")

■ The error in the argument is that Northwest is the entity that is the creditor in this case, not Bucyrus. Distribution under 11 U.S.C. § 726 is made to creditors. "Creditor" means an "entity that has a claim against the debtor ..." 11 U.S.C. § 101(9). Bucyrus was not a corporation or a partnership, estate, or trust, such as are included within the meaning of the term "entity" under section 101(14) and (35). It is called a "division," which is generally understood to mean an operating or administrative unit of a business. *Black's Law Dictionary* 430 (5th ed. 1989).

■ The failure to list Bucyrus in Erie so that the Clerk's office would send notice specifically to such a division in Erie does not render notice to the correct entity defective. *Worthing v. Connecticut National Bank*, 24 B.R. 774 (Bankr.D.Conn.1982) ("Although a creditor may choose to operate its business by dividing its activities into various departments, it may not use that method of operation as a shield against notice properly sent to the creditor in its name and at its place of business.").

■ The debtor was not in error in listing the Green Bay and Boston addresses in the matrix and schedule of creditors. The Green Bay address appeared on the UCC–1 financing statement the debtor signed. The debtor and creditor were corresponding using the Green Bay address almost up until bankruptcy. Invoices from the creditor required the debtor to remit payments to the Boston address. Apparently, out of an abundance of precaution, the debtor listed both addresses, and the Clerk of Court used these addresses in mailing the notices.

2

■ To the question whether the court notice was actually received by the creditor, the Clerk's certificate of mailing using the addresses at Green Bay and Boston is sufficient evidence to create the presumption that Northwest did receive the notice. *In re Dodd, supra.*

In rebuttal, Northwest offered the testimony of Forsman and the answer of Ward to interrogatories. Forsman testified that bankruptcy notices received at Boston, Green Bay or Erie were to be routed to him at his Green Bay or Erie office. Copies of the notices would then be placed in customer files.

Forsman also testified that he does not remember receiving the notice in question, and that he searched the debtor's customer file and failed to find a copy of the court order in the file.

■ The creditor argues that this evidence rebuts the presumption. Implicit in the argument is that Northwest does not "receive" a notice until it is placed on Forsman's desk, and that nonreceipt by Forsman is proof of nonreceipt by Northwest. The argument is not persuasive.

■ An integral part of each of the addresses in Boston, Green Bay and Erie is the particular post office box used by the creditor to receive mail. When mail reaches one of the these boxes, it has been received by Northwest. If mail is mishandled after it reaches that box, it obviously may not reach the desk of Forsman. Receipt, however, should not depend on internal handling by employees and whether it reaches a certain desk in the company.

The procedure followed by Northwest in handling bankruptcy notices before they reach Forsman is not clear. The evidence does not show which employees are responsible for getting mail from the post office boxes, opening it, and dispatching it to Forsman, or the method and safeguards used to protect against error. On the other hand, there is sufficient evidence to show that much handling must take place,[5] which

---

5. Mail received at Boston furnishes an example

of the circuitous route and extensive handling

introduces the likelihood of mishandling. According to Forsman, some mishandling did take place between Boston and Green Bay or Erie. This lack of sufficient evidence of mail handling weakens the argument that the creditor did not receive the notice because Forsman does not remember receiving it and could not find a copy in the customer file. Forsman was not the person who opened the post office boxes to get the mail.

■ With respect to the search of the customer file of the debtor for a copy of the notice, Forsman made the search prior to leaving the company two and a half years after the bankruptcy. He does not state whether the file contained any other evidence of receipt of the notice, such as letters or memorandums of telephone calls. The naked statement of Ward that there is "no record of receiving notice" is entitled to little weight. There is no evidence of Ward's identity or what he did to make that determination. In order to support a finding of the nonexistence of the presumed fact of receipt, a party must do more than show he searched relevant files but found no notice. *In re Dodd, supra.*

Even if the evidence arguably could be said to be strong enough to rebut the presumption, it would not be dispositive, because, in accordance with Rule 301, Federal Rules of Evidence,[6] the trustee has met the burden originally cast of proving receipt.

At about the time of bankruptcy, the creditor was receiving mail from other parties at the addresses used to mail the court notices. Neither one of the notices mailed by the Clerk's office was returned undelivered. This case would be closer if only one notice had been mailed. Several weeks before the court notice, the debtor and creditor began to correspond about the delinquent debt. The correspondence continued until just before bankruptcy. There was no evidence of nonreceipt of these letters. A letter about the case was mailed by the trustee to the creditor at Green Bay two weeks before the court order. It was not returned undelivered; receipt was not denied. Shortly after it was mailed, counsel for the creditor got in touch with the trustee in response to the letter. The trustee and the attorney worked closely together for 90 days to resolve the security interest problem of the creditor and the trustee in the inventory.

Both Forsman and counsel appeared in the case at the meeting of creditors held 90 days before the bar date for filing claims. It is difficult to believe that the creditor, through counsel, had notice of the date and time set for the meeting of creditors, attended the meeting, and participated in the case for 90 days, yet had no notice of the final date set for filing claims. Both dates appeared on the same court order fixing them.

Moreover, an attorney attending a meeting of creditors in a case should be aware of the possibility of a 90–day bar date and the need to investigate. As in all Chapter 7 liquidation cases, in implementing 11 U.S.C. § 501, Bankruptcy Rule 3002(c) set the time limit for filing claims in this case. Under this rule, unless a creditor is notified by the court that assets are insufficient to pay a dividend,[7] which did not happen here, a claim must usually be filed within 90 days after the first date set for the meet-

---

required after it leaves the post office box. The mail must be carried from the post office box in Boston to the Bank, from the Bank to a carrier, from the carrier to Northwest where mail is opened, and finally from there to Forsman. There is no evidence that Forsman was involved in any of this handling.

6. *Fed.R.Evid.* 301 provides in part:
   ... [A] presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

7. Bankruptcy Rule 2002(e):
   In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims.

ing of creditors. The court order announcing July 17 as the bar date merely followed the rule. Rule 3002(e) is obviously binding on all creditors in Chapter 7 cases. As one of the rules of practice and procedure under Title 11, U.S.Code, Rule 3002(e) governs the time for filing claims in this court.

From the evidence the court concludes, aided by the presumption of receipt and the lack of clear and convincing rebuttal evidence of nonreceipt, that the creditor did receive the official court notice of the case in time for timely filing a proof of claim.

### 3

■ To the question whether the creditor had sufficient notice of the case other than through the official court notice, the creditor argues that the proof of claim needs to be filed within the time limit *only* if the court sent the creditor an official notice containing the bar date.

The argument will be considered even though the court has held that the court notice was received. The argument fails because notice of the case is all that is required under section 726(a)(2)(C) and the court notice is not the only means by which the creditor could receive notice of this case. The trustee gave the creditor notice. One week after this case was filed, the trustee sent the creditor a letter which identified this case and stated that the creditor had been listed therein as a creditor. Although it did not mention the bar date for filing claims, it was sufficient to put the creditor on notice to inquire about the bar date.

Section 726(a)(2)(C) and (a)(3) requires only that the creditor have some kind of "notice ... *of the case* in time for timely filing a proof of such claim ..." The notice does not necessarily have to come from the court and does not have to contain all the information found in a court notice, such as bar dates, but it must be given timely. This standard of notice has been applied under 11 U.S.C. § 523(a)(3)(B) when a creditor with notice or actual knowledge has allowed the time for filing a proof of claim or a dischargeability complaint to expire. Under that section, as here, the time expires if the creditor had "notice or actual

knowledge *of the case* in time for such timely filing ..." (Emphasis added.) *Byrd v. Alton (In re Alton)*, 837 F.2d 457 (11th Cir.1988).

In *Byrd* the debtor had failed completely to list the creditor, but some three weeks after bankruptcy sent the creditor a letter notifying the creditor of the case. The court, noting the seeming conflict of Bankruptcy Rule 4007(c), requiring official notice to a creditor, with section 523, which does not specify a particular kind of notice of the case to a creditor, decided, "A holding that the language of Rule 4007(c) about notice gives a creditor the right to such official notice before he is under a duty to make inquiries to protect his own rights would conflict with the language of 11 U.S.C. sec. 523, which makes actual notice sufficient to impose a duty-to-inquire on the creditor. We decline to interpret the Rule in a way that would engender such a conflict."

### *Actual Knowledge*

The creditor admittedly had actual knowledge of this case in time for timely filing a proof of claim. The creditor and counsel for the creditor began to participate in the case 90 days before the time limit set for filing claims.

Section 726(a) protects a creditor that did not have "notice or actual knowledge of the case in time for timely filing" a proof of claim. The section penalizes a creditor with such knowledge who fails to act. "Though it is in the interest of the estate to encourage timely filing, when tardy filing is not the result of a failure to act by the creditor, the normal subordination penalty should not apply. Third distribution is to general unsecured creditors who tardily file." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 383 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 96–97 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

Under the language of section 726(a), "notice or actual knowledge of the case," notice and actual knowledge are equated. Proof of either notice or knowledge is sufficient to trigger the operation of the section. The notice need only be "of the

case." The same language is found in 11 U.S.C. § 523(a)(3)(A) and (B), which protects a creditor without "notice or actual knowledge of the case." The notice is not required to contain a bar date. *Byrd v. Alton (In re Alton)*, 837 F.2d 457 (11th Cir.1988), a case under section 523(a), holds that "The statutory language [of section 523(a)(3)(A) and (B) ] clearly contemplates the mere knowledge of a pending bankruptcy proceeding is sufficient to bar the claim of a creditor who took no action, whether or not that creditor received official notice from the court of various pertinent dates."

> ... This furthers the bankruptcy policy of affording a "fresh start" to the debtor by preventing a creditor, who knew of a proceeding but who did not receive formal notification, from standing back, allowing the bankruptcy action to proceed without adjudication of his claim, and then asserting that the debt owed him is undischargeable.

*In re Alton, supra,* at 460.

In the defense of the creditor's position advanced in this case, counsel for the creditor has cited or relied on cases decided on the question of due process under reorganization bankruptcy cases, such as *Spring Valley Farms Inc. v. Crow*, 863 F.2d 832 (11th Cir.1989); *In re Charter Company*, 68 B.R. 396 (Bankr.M.D.Fla.1986); *In re Chicago Pacific Corporation*, 773 F.2d 909 (7th Cir.1985); and *New York v. New York, N.H. & H.R. Co*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953). These cases set the standard for notice in reorganization cases.

■ Section 726 governs notice in liquidation cases, as here. Section 726 does not apply to Chapter 11 reorganization cases. See 11 U.S.C. § 103(b). Likewise, Bankruptcy Rule 3002(c) setting the 90–day limit for filing claims, by its language, applies only to cases under Chapter 7 and Chapter 13. Section 726, with its notice provisions, is unique to Chapter 7 cases. There is obviously no comparable section for distribution of property of the estate applicable to Chapter 11 cases.

In a reorganization case under Chapter 11 separate principles apply. *In re Colum-*

*bia Ribbon & Carbon Manufacturing Co. Inc.*, 54 B.R. 714 (Bankr.S.D.N.Y.1985). Unlike a Chapter 7 case in which assets are liquidated and final distribution takes place by the trustee after liquidation, Congress did not penalize a creditor with mere "notice or actual knowledge of the case" that fails to act in a reorganization case in which the debtor pays creditors pursuant to a court-confirmed plan usually over a period of time.

A recent case from this Circuit recognizing the different standards of notice under section 523, containing language identical to section 726 with respect to notice, and under Chapter 11 cases not involving section 523 is *Spring Valley Farms Inc. v. Crow (In re Spring Valley Farms Inc.)*, 863 F.2d 832 (11th Cir.1989). There the court indicated clearly that it did not overrule the case of *In re Alton, supra*, which interpreted the section 523 language, "notice or actual knowledge of the case," to mean that the notice does not necessarily have to include a bar date. Following *New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953), the *Spring Valley* court went on to decide that, because section 523 does not apply to corporate debtors and creditors of corporate debtors (the creditor there was an individual), the standards of a Chapter 11 notice must apply, that is, a notice to be sufficient must contain a bar date and the burden is not on the creditor to act to discover the bar date.

Section 726 *does* apply to corporate creditors (and corporate debtors). By definition, the word "creditor" includes corporations. See 11 U.S.C. § 101(9), (14), (35). Since this is a Chapter 7 case, section 726 applies, simple notice of the case is sufficient, the burden is on the creditor with notice to act, and the creditor without notice is protected.

Counsel for the creditor argues that *Spring Valley* and the other cases cited in brief involving reorganization are controlling in this liquidation case, without advancing a good faith argument for not following the provisions of section 726 and

without questioning the constitutionality [8] of this section. It is confusing, misleading and inexcusable to ignore existing applicable statutory provisions while espousing case law applicable to other statutes.

### Excusable Neglect

The creditor in brief argues that the neglect to file a timely claim is excusable and, therefore, the time should be extended under Bankruptcy Rule 3003(c)(3) for filing a proof of claim.

Rule 3003(c)(3) must be read in conjunction with Rule 9006(b)(1), which provides that the court for cause shown may "on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of *excusable neglect.*" (Emphasis added.) The rule requires a motion to be filed.

Not only is there no such motion before the court, but the creditor has failed to advance a reason to show that the failure to file a timely claim was due to circumstances beyond the reasonable control of the creditor, which is the standard for excusable neglect.

The requirement of the standard is rigid. A bankruptcy treatise, in discussing the standard, noted that:

The courts considering the standards by which "excusable neglect" should be measured have adopted the rule of *Beneficial Finance Co. v. Manning (In re Manning)* [4 B.C.D. 3004 (Bankr.D.Conn. 1978)], which stated that "the failure to timely perform a duty due to circumstances which were beyond the reasonable control of the person whose duty it was to perform" constitutes excusable neglect. Nothing else does.

9 *Collier on Bankruptcy,* ¶ 9006.06 (15th ed. 1988).

The case adopting this requirement in this Circuit, relied on by the creditor, is *Biscayne 21 Condominium Association Inc. v. South Atlantic Finance Corpora-tion (In Re South Atlantic Financial Corporation),* 767 F.2d 814 (11th Cir.1985) ("Courts have been most willing to find excusable neglect where the movant failed to comply with the bar date because, through no fault of its own, it had no notice of that date.")

The creditor has not shown excusable neglect.

As already decided, the creditor had sufficient notice of this case, both from the trustee and the court. Lack of notice then is not available here as an excuse. Once warned of a bankruptcy case, the obvious creditor question is whether a dividend will be paid. If the creditor, being so warned, had, through its attorney, made a minimal effort to determine the likelihood of a dividend to creditors, an inspection of the case file containing the bankruptcy petition would have shown assets valued at $981,500 and secured claims of less than that. The inspection would also have revealed the official court notice to file a claim because of possible assets. Instead, the creditor, aware of the 90–day time limit for filing claims in bankruptcy cases according to Forsman, apparently made no such effort and cannot now properly complain of the consequences of such inaction.

The attorney for the creditor argues that his client did not send him a copy of the court order and, therefore, he was not aware of the bar date for filing claims. He says he was occupied with other aspects of the case and did not learn that this was an asset case in time to file a claim. The argument is disingenuous. The attorney appeared in the case and participated in it for 90 days before the bar date. It is incredible that an attorney, who had handled hundreds of bankruptcy cases before, would seriously argue that he did not find out about the bar date in time in a case of this size on which he worked so long. The same argument was advanced without success in *In re Rhodes,* 61 B.R. 626 (9th Cir. BAP 1986), except there the attorney ad-

---

**8.** The constitutionality of section 523(a)(3) came under attack in *In re Alton, supra,* on the issue of due process. The court upheld the section because Congress had furnished statutory pro-tection to creditors against loss of a claim without notice. See 11 U.S.C. § 523(a)(3)(A) and (B).

mittedly lacked knowledge of the Bankruptcy Code and Rules.

 The only other excuse offered for the neglect to file a timely claim, as already mentioned, was the constant involvement of the attorney in other matters in the case and the assumption that the case would be a no-asset case because dividends are rarely paid in cases in this court.[9] Such an excuse does not meet the rigid standards of excusable neglect followed in this Circuit in the context of bankruptcy cases. The neglect here was not beyond the reasonable control of the creditor.

An appropriate order will enter.

### ORDER ALLOWING CLAIM

Pursuant to the opinion of the court entered this date, it is

ORDERED that the claim of the creditor, Bucyrus Construction Products, Division of Northwest Engineering Company, is allowed as unsecured in the amount of $145,231.29 and shall be paid along with claims in the third priority under 11 U.S.C. § 726(a).

---

**9.** While it is true that dividends are rarely paid in cases involving individual consumer debtors, the assumption is dangerous in cases involving business debtors, especially in a case with assets approaching a million dollars, as here.