**In re PETROLEUM PRODUCTION MANAGEMENT, INC., Debtor.**

**Bankruptcy No. 97–20144–11.**

United States Bankruptcy Court,
D. Kansas.

June 24, 1999.

**25.** Doc. # 173.

**408**

Timothy H. Girard, Woner, Glenn, Reeder & Girard, P.A., Topeka, KS, for Northern Natural Gas Company.

John Cruciani, Lentz & Clark, P.A., Overland Park, KS, for Official Unsecured Creditors' Committee.

### MEMORANDUM OPINION[1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

Petroleum Production Management, Inc. ("PPMI") received checks from Northern Natural Gas Company under a gas supply contract. When PPMI entered Chapter 11, it mailed a notice of claims bar date to the Texas address on Northern's checks. Although the mail handling room at the Texas address routinely forwarded Northern's mail to its Nebraska office, where proofs of claim were handled, the notice never arrived there. Was the notice sufficient? Yes, the notice was sufficient to bar Northern's claim. The court therefore denies Northern's motion to file its claim out of time.[2]

1. Northern Natural Gas Company ("Northern") appears by its attorney, Timothy H. Girard of Woner, Glenn, Reeder & Girard, P.A., Topeka, Kansas; the Official Unsecured Creditors' Committee ("Committee") appears by its attorney, John Cruciani of Lentz & Clark, P.A., Overland Park, Kansas.

2. Motion of Northern Natural Gas Company to File Proof of Claim Out of Time and Memo-

## The Maurice L. Brown Company

The Maurice L. Brown Company operated oil and gas properties in several midwestern states before its employees bought the company. The employee buyout agreement gave the buyers the right to use The Maurice L. Brown Company name for five years. At some point, the company changed its name to Petroleum Production Management, Inc. On January 23, 1997, it filed for Chapter 11 relief and the United States Trustee subsequently appointed an Unsecured Creditors' Committee.

## Endowment Energy Partners, L.P.

Endowment Energy Partners, L.P. ("EEP"), an investment group, held a security interest in virtually all of PPMI's assets. EEP opposed PPMI's reorganization effort and pressed for sale of its collateral to Global Millennium Energy. EEP eventually convinced PPMI and the Unsecured Creditors' Committee to sell the company. EEP accomplished this by agreeing to place $550,000 of its cash collateral into escrow for unsecured creditors. Thus, under the sale agreement, unsecured claim holders were to recover approximately 55 cents on the dollar.

Even before the sale agreement, however, Northern Natural Gas Company moved to file a proof of claim out of time, alleging it had failed to file on time because of excusable neglect. The Unsecured Creditors' Committee, aware of Northern's motion at the time of the sale and escrow agreement, now predictably opposes it because, if successful, Northern's motion would dilute unsecured claim holders' recovery.[3]

## The Record

The Committee and PPMI stipulated to certain facts in the pretrial order.[4] On April 22, 1999, they presented evidence. The court directed the Committee to proceed first because the validity of the mailed notice was at issue and if the Committee could prove that PPMI properly mailed the notice, a presumption of receipt would arise for Northern to rebut. In its case in chief, the Committee called four witnesses: Paul Hoffman, PPMI's counsel; Larry W. Miller, PPMI's vice president/comptroller who helped with the schedules; Mark Benedict, EEP's counsel; and Glenn R. Hass, an employee of Northern's gas supply division in Omaha, Nebraska. In its case in chief, Northern called Jane Green Alseth, an attorney in Northern's gas supply division in Omaha, and Larry W. Miller, PPMI's vice president/comptroller. In rebuttal, the Committee called Christopher J. Ryan, the chairman of the Unsecured Creditors' Committee. The following narrative weaves together the stipulations with the testimony and exhibits received in evidence.

## Enron Corp

Enron Corp, the corporate parent of Northern Natural Gas Company and a major force in the energy business, operated in all 50 states and internationally. It had as many as 11,000 employees and numerous affiliates, at least five of which Glenn Hass named in his testimony. Enron owned a 70-story building in Houston, Texas, which served as its corporate headquarters. Its mailing address there was P.O. Box 1188, Houston, Texas 77251–1188.

Glenn Hass, an employee of Northern's gas supply division in Omaha, testified that

---

randum in Support Thereof filed November 28, 1997 (Doc. # 286).

**3.** The parties have stipulated to the jurisdiction of the bankruptcy court and consented to the trial and entry of a final Order by the bankruptcy court. The court finds independently of the stipulation that this proceeding is core under 28 U.S.C. § 157 and that the court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan.Rule 83.8.5).

**4.** Final Pretrial Conference Order filed September 3, 1998 (Doc. # 433).

the central mail room at Enron Corp's Houston headquarters received mail for the various Enron Corp entities, including Northern. An independent third-party contractor operated the mail room. Mail room personnel knew that Northern was an affiliate of Enron Corp and routinely routed Northern's mail to Northern's Omaha offices. Glenn Hass himself regularly received mail that was forwarded from the Houston mail room.

The headquarters also housed both the Enron Litigation Unit and Northern's marketing division lawyer. The Enron Litigation Unit attorneys performed legal services for Northern from time to time.

**Northern Natural Gas Company**

Northern Natural Gas Company, Enron Corp's subsidiary, was a petroleum products transportation company with over 1,000 employees in six divisions operating pipelines throughout the country. Its home office address was 1111 South 103rd Street, Omaha, Nebraska.

Jane Green Alseth, an attorney with Northern's gas supply division in Omaha, testified that at the time in question, she was responsible for filing proofs of claim. She testified about the company's organization and its relationship with PPMI. She stated that Northern maintained an office in the Enron Corp headquarters building in Houston, and both its accounting and finance division and its marketing division attorney had offices there. Although the Enron Litigation Unit was also in the Houston office, the legal department for Northern's gas supply division was located in Omaha.

Northern allegedly held a claim against PPMI for reimbursement of Kansas ad valorem tax overpayments. Northern's gas supply division made the overpayments when it purchased gas from PPMI's predecessor, The Maurice L. Brown Com-

pany, under contracts that were eventually canceled. Northern and The Maurice L. Brown Company (succeeded by PPMI) have been litigating Northern's claim before regulatory boards and courts since 1983.

The contracts between Northern's gas supply division and PPMI's predecessor required notice to Northern Natural Gas Company, 2223 Dodge Street, Omaha, Nebraska 68102. The contracts were canceled when, effective in 1993, Northern decided to end its gas purchasing business and become exclusively a pipeline company. Thereafter, the address of Northern's gas supply division became Northern Natural Gas Company, P.O. Box 3330, Omaha, Nebraska 68124.

**The Notice**

On May 16, 1997, PPMI obtained an order fixing June 13, 1997, as a bar date for filing claims.[5] On May 23, 1997, PPMI mailed the notice of bar date[6] to "Northern Natural Gas (Enron Gas Processing), P.O. Box 1188, Houston, TX 77251–1188."[7] The notice explained that Northern's claim was disputed, contingent, or unliquidated and advised Northern that it must file a proof of claim by the June 13 deadline. Northern, however, failed to file a proof of claim by the June 13, 1997, bar date.

Although PPMI's notice advised Northern that a proof of claim must be filed, PPMI had failed to list Northern's claim on its schedules as disputed, contingent, or unliquidated by the time it mailed the notice of bar date on May 23, 1997. When PPMI became aware of this omission, it moved, on July 7, 1997, to amend its schedules to show Northern's claim as disputed, contingent, or unliquidated.[8] It mailed a notice of the motion to amend to Northern Natural Gas (Enron Gas Processing), P.O. Box 1188, Houston, Texas 77251–1188, the same address it used for

---

5. Doc. # 129.

6. Doc. # 128.

7. Certificate of Service filed May 27, 1997 (Doc. # 138).

8. Doc. # 166.

the bar date notice. Northern did not object or otherwise respond to this notice, the motion was granted, and the schedules were amended accordingly. The court's order, among other things, deemed Northern's claim to have been listed as disputed, contingent, or unliquidated and disallowed it.[9]

## The Presumption

Paul Hoffman, PPMI's Chapter 11 counsel, testified that he supervised the preparation of the schedules. In that process, he relied on Larry Miller, Northern's vice president/comptroller, to furnish him with the names and addresses of its approximately 1,500 creditors holding claims totaling approximately $1.1 million. Although Miller had been with The Maurice L. Brown Company before it became PPMI and had corresponded in 1993 with Northern at its Omaha address, he did not remember the correspondence when he included Northern's name and address in the bankruptcy schedules. Rather, he relied on Northern's address stamped on checks Enron had written for Northern payable to The Maurice L. Brown Company. Miller viewed Enron Corp and Northern as the same for purposes of mailing.

Copies of the checks Enron wrote for Northern are Trial Exhibits D and E in evidence. They showed on their faces the names Enron Corp and Northern Natural Gas Company, P.O. Box 1188, Houston, Texas, 77251–1188. They were written payable to PPMI's predecessor, The Maurice L. Brown Company, and dated October 23, 1989, and September 23, 1993, respectively.

Enron Corp issued the check dated October 23, 1989 (Exhibit D), to The Maurice L. Brown Company on behalf of Northern in response to a letter (Exhibit 20) dated October 3, 1989, addressed to Northern at 2223 Dodge Street, Omaha, Nebraska 68102. Larry Miller wrote the letter requesting payment for ad valorem taxes paid by PPMI under gas supply contracts applicable to leases for years 1987 and 1988.

Enron Corp also issued the check dated September 23, 1993 (Exhibit E), on Northern's behalf. The evidence did not tie this check to correspondence from PPMI. According to the testimony, both checks were sent as payment for performance under gas supply contracts between Northern and PPMI's predecessor that terminated March 29, 1993 (although the termination agreement is dated February 1, 1993).

Mark Benedict, counsel for EEP, testified that EEP mailed a notice of hearing on a motion to dismiss the case to "Northern Natural Gas (Enron Gas Processing), P.O. Box 1188, Houston, TX 77251–1188" (the file shows it was sent October 29, 1997). The Enron Litigation Unit received the notice of hearing seven days after it was mailed. Later, the Enron Litigation Unit received a copy of the order and notice of hearing on approval of disclosure statement which was mailed to the same address. Although Northern denied receiving the bar date notice, it did concede that the Enron Litigation Unit received these mailings at the Houston address.

Northern and its counsel contend that they did not have actual or constructive knowledge of PPMI's bankruptcy case earlier than October 10, 1997.[10] Tim Girard, Northern's counsel, appeared in the PPMI case on November 12, 1997, to advise the court that his client would be pursuing a claim in the case. He entered his appearance on that date and filed the motion for leave to file the claim out of time on November 28, 1997, almost six months after the June 13, 1997, bar date.

### CONCLUSIONS OF LAW

**Receipt Presumed**

The cases discussing the principles controlling mailed notice are collected

---

**9.** Doc. # 170.

**10.** Pretrial Conference Order filed September 3, 1998, at 5 (Doc. # 433).

**412**

and summarized in *Board of County Comm'rs of Saline County, Kansas v. Coleman American Properties, Inc. (In re American Properties, Inc.).*[11] According to these principles, a presumption that mail is received by its addressee arises when it has been properly addressed, stamped, and deposited in the mail system. To activate the presumption, however, the sender must prove the mailing was properly done, although the individual employee who performed that function need not testify. The sender can carry the burden of proving proper mailing by showing that customary and normally effective mailing procedures were followed. However, the presumption falls if an incorrect address is used. Yet, if the address is only slightly incorrect, most courts find the presumption is only weakened. Likewise, a less definite address will suffice if the addressee is a well-known public entity or business. Finally, as a matter of law the addressee's denial of receipt does not rebut the presumption; rather, it creates a question of fact.[12]

■ Larry Miller never received any communication, written or oral, from Northern or Enron Corp advising him that the Houston, Texas, address was incorrect. Northern does not dispute that the Houston post office box was an accurate address for Northern or that mail addressed to it there was customarily forwarded to its Omaha office. No mail sent to this address was ever returned to the debtor.

Paul Hoffman's testimony established that the notice was properly addressed to Northern at the address on its checks: P.O. Box 1188, Houston, TX 77251–1188, and that it was deposited in the United States mail, postage prepaid. This evidence raised a presumption that the addressee received the notice. The presumption is bolstered by evidence that the Enron Litigation Unit in Houston received

notices mailed later. On this state of the record, the presumption of receipt remains unrebutted.

**Excusable Neglect**

■ Northern premised its motion on excusable neglect, citing the 1993 United States Supreme Court opinion in *Pioneer Investment Servs. Co. v. Brunswick Assocs. Ltd. Partnership.*[13] *Pioneer* was a Chapter 11 case in which the court clerk scheduled the initial creditor's meeting for May 5, 1989, and mailed a "Notice of Meeting of Creditors." The notice stated, "Bar date is August 3, 1989." An officer of the creditor received the notice and attended the May 5 meeting. Later, he forwarded the file, including the notice, to an experienced bankruptcy attorney and inquired whether there was a deadline for filing claims. The attorney assured him that no bar date had been set and that there was no urgency in filing proofs of claim. Both the officer and the attorney then attended a June 16, 1989, meeting of creditors. Twenty-one days after the August 3 bar date, the creditor filed a motion to permit untimely filing of the claim for excusable neglect under Rule 9006(b)(1). In the motion, the attorney asserted that withdrawal from his former law firm on July 31, 1989, impeded his access to the case file until after the bar date had passed in early August.

The bankruptcy court denied the motion and held that a party may claim "excusable neglect" only if its failure to timely perform a duty was due to circumstances which were beyond its reasonable control.[14] This district court affirmed in part and reversed in part. Because it believed that the Sixth Circuit would apply a more liberal standard of excusable neglect, the district court remanded with instructions that the bankruptcy court apply the factors ex-

11. 30 B.R. 239 (Bankr.D.Kan.1983).

12. *Id.* at 243.

13. 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993).

14. *Id.* at 384, 113 S.Ct. 1489.

pressed in *In re Dix*,[15] a Ninth Circuit Bankruptcy Appellate Panel decision, and determine whether the failure to comply with the bar date "resulted from negligence, indifference or culpable conduct on the part of a moving creditor or its counsel."[16] The bankruptcy court applied the *Dix* factors but again denied the motion because the reason for the delay was not outside the creditor's control and because the creditor's counsel was negligent in missing the bar date. The district court affirmed and the case was appealed to the Sixth Circuit Court of Appeals, which reversed.

Having granted *certiorari*, the Supreme Court, in a five-four decision written by Justice White, held that determining "excusable neglect" in the context of late-filed claims in Chapter 11 is an equitable inquiry over which bankruptcy courts have broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization. Accordingly, the Court's opinion adopted the following four nonexclusive factors established by the lower courts for determining excusable neglect where a claim was untimely filed: (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith.[17]

Although in *Pioneer* the creditor failed to act before the bar date, it did receive the bar date notice in time to do so. Here, Northern claims not to have received notice of the bar date and not to have become aware of the bankruptcy until well after the deadline passed. A stipulation in the Pretrial Order states that the Enron Litigation Unit received a notice of Motion to Dismiss the case (sent by EEP) seven (7) days after it was mailed.[18] This Motion to Dismiss appears in the evidence as Creditors' Committee Trial Exhibit H. It was marked received by the Enron Litigation Unit on November 5, 1997, and the envelope in which it was mailed, attached to Exhibit H, shows the EEP mailed the notice on October 29, 1997. This means that Northern can be charged with notice of the bankruptcy at least as early as November 5, 1997, although Northern states in the contentions section of the Pretrial Order that it had knowledge of the bankruptcy as early as October 10, 1997.[19] Northern's counsel first appeared in the case at a hearing on November 12, 1997. The only two trial witnesses called who potentially had knowledge of what happened to mail received in the Enron mailroom were Jane Green Alseth and Glenn R. Hass. Neither testified concerning when Northern first became aware of the bankruptcy. The court has found that Northern is presumed to have received the notice in time to respond within the deadline. The lack of evidence to rebut this presumption also hampers Northern's reliance on excusable neglect.

Although the court doubts whether the *Dix* factors need be applied here since they were designed for the factual pattern in *Pioneer* rather than for the paradigm of this case, the court will nevertheless discuss them here.

First, there is no danger of prejudice to the debtor in this case because the debtor has sold all of its assets to Global Millennium Energy and is no longer impacted by this decision.

Second, there is no contention or evidence suggesting Northern acted in bad faith. Overlooking for the moment the presumption that Northern received the

---

**15.** 95 B.R. 134 (9th Cir. BAP 1988).

**16.** 507 U.S. at 385, 113 S.Ct. 1489.

**17.** *Id.* at 395, 113 S.Ct. 1489.

**18.** Final Pretrial Conference Order filed September 3, 1998, at 4–5 (Doc. # 433).

**19.** Final Pretrial Conference Order filed September 3, 1998, at 6 (Doc. # 433).

notice, the court notes that Northern claims to have filed its motion when it finally became aware of the bankruptcy, albeit well outside the bar date. So far as the evidence shows, this claim is factually correct but irrelevant in light of the unrebutted presumption of receipt. Still, no bad faith is evident, and consequently this factor weighs in favor of Northern.

A third factor examines the length of delay and the impact of the delay on the judicial proceeding. Northern filed its motion to file out of time on November 28, 1997, over five-and-one-half months after the June 13 bar date. Disregarding the unrebutted presumption of receipt, the court notes that the stipulation shows Northern became aware of the bankruptcy by November 5, 1997. As the court discusses *infra*, the nearly six-month delay was caused by Northern's failure to arrange its mail-receiving affairs to insure prompt receipt of notice. The court finds the length of the delay was substantial, but finds little evidence that the delay itself significantly impacted the judicial proceedings. Thus, this factor weighs to some extent against Northern.

█ The fourth *Dix* factor involves the reason for Northern's delay in filing its claim and whether the delay was within its reasonable control. This factor weighs heavily against Northern. Unlike in *Pioneer*, where this factor focused on the creditor's response to a received notice of bar date, here the factor focuses on whether Northern reasonably arranged its mail receiving and routing procedures before the notice was ever sent, indeed before the case was even filed. Obviously Northern controlled the instructions it gave customers on where to reach it by mail, the location where it would receive its mail, and the procedures for routing its mail once it was received there. Thus, if Northern wished to rely on excusable

neglect to exonerate it for not receiving notice, it had the burden of proving that it acted reasonably in setting up its routing procedures in a manner that would insure its mail would reach those responsible for filing proofs of claim. When receipt of notice is not acknowledged, as in this case, and the debtor has fulfilled its responsibility by mailing the notice to a proper address, the addressee must produce evidence showing that its mail-routing procedures were reasonable and sufficient or that, if not, its failure to correct them was excusable. Northern has offered no such evidence. Neither Jane Green Alseth nor Glenn R. Hass testified about the procedures at the Enron mailroom, leaving the court with no basis for finding that Northern's conduct was not neglectful, or if so, was excusable.

Rather than produce evidence concerning its procedures for receiving mail, Northern faults PPMI for failing to send the bar date notice to Omaha, instead of Houston, even though Northern's checks clearly showed its Houston address. Further, it contends that PPMI should have sent the notice to its Omaha office because Northern sent checks to The Maurice L. Brown Company in response to 1989 and 1993 letters from Larry Miller addressed to Northern in Omaha discussing gas supply contract obligations. Those contracts, although canceled in 1993, required notice to Northern's Omaha address.[20]

Other courts, however, have rejected Northern's "it should have been sent somewhere else" argument. In *Worthing v. Connecticut Nat'l Bank*,[21] a 1982 Connecticut bankruptcy case, the clerk sent a bar date notice to the bank's general address taken from the schedules, rather than to its commercial loan department located at the same address. Finding the notice sufficient, *Worthing* reasoned that failure to send notice to a particular de-

---

**20.** *See* Termination Agreement dated February 1, 1993, Northern Natural Gas Company's Trial Exhibit No. 2.

**21.** *Worthing v. Connecticut Nat'l Bank (In re Worthing)* 24 B.R. 774, 776 (Bankr.D.Conn. 1982).

partment of a corporate creditor does not render a notice sent to the creditor's principal place of business defective. A creditor who chooses to operate its business by dividing its activities into various departments cannot shield itself against notice properly sent to the creditor in its name and at its place of business.[22]

Another bankruptcy decision, *In re Riverchase Apartments, L.P.*, considered the notice issue in the context of a county's adversary action to relieve its property tax claim from the effect of a confirmed reorganization plan. The county failed to file a proof of claim although counsel for the debtor mailed a certified copy of the involuntary petition and various notices of proceedings to the Campbell County Clerk. The clerk lodged and recorded the petition in his office but did not advise the county legal department of its receipt. Denying receipt of notice, the county sought an order declaring that the confirmation discharge had no effect on its claim. But the court found the notice constitutionally valid and otherwise sufficient, stating: "Once the notice was received by the Campbell County Clerk, delivery to the appropriate person within the County system was the responsibility of the Campbell County Clerk's Office."[23]

Most on point is a 1989 decision by an Alabama bankruptcy judge, the Honorable A. Pope Gordon, in *In re Ray Brooks Machinery Company, Inc.*[24] The notice issue facing Judge Gordon in *Ray Brooks*

controlled a priority question under the language of § 726(a)(2)(C)(i). This Code section hinges priority on "notice or actual knowledge of the case in time for timely filing a proof of such claim...." The creditor was organized to receive mail at post office box addresses not only in Green Bay, Wisconsin, and Boston, Massachusetts, but also in Erie, Pennsylvania. Gathering addresses from correspondence, invoices, and UCC financing statements, the debtor listed only the creditor's Green Bay and Boston addresses in its schedules. Accordingly, the clerk mailed a bar date notice to the creditor's post office boxes in both Green Bay and Boston, and the postal service did not return either letter. The person responsible for filing the creditor's proofs of claim, its credit manager, ordinarily received mail sent to Green Bay and Boston at the Erie, Pennsylvania, address. He denied ever receiving the notices, and the creditor complained that the notice was misdirected by the debtor. Nevertheless, Judge Gordon found the notices sufficient, commenting that "receipt, however, should not depend on internal handling by employees and whether it reaches a certain desk in the company."[25] Thus, the court finds that Northern's failure to timely act was not due to circumstances beyond its reasonable control.

■ Though it is not an expressed *Pioneer* factor, EEP and the Creditor's Committee urge this court to also consider and weigh the effect that a late-filed claim will

**22.** *Id. See also, National Union Fire Ins. Co. v. Broadhead,* 155 B.R. 856, 858–59 (S.D.N.Y. 1993) (neither the Bankruptcy Code nor due process requires the notice of bankruptcy proceedings be addressed to specific division of creditor; once delivered, it is the responsibility of the creditor to see that notice is distributed to appropriate party within the creditor's organization); *Nalco Chemical Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* No. 92 CIV. 8722 (LJF), 1993 WL 127180, *6 (S.D.N.Y. Apr. 22, 1993) (late-filed claim was properly disallowed by bankruptcy court where late filing was fault of creditor's own internal routing procedures); *In re Lee & Sons, Inc.,* 95 B.R. 316, 318 (Bankr.M.D.Pa. 1989) (court refused to overlook bar date for

filing proof of claim, where creditor's failure to file timely claim was result of creditor's own failure to distribute mail to its proper division).

**23.** *Riverchase Apartments, L.P. v. Campbell County, Commonwealth of Kentucky (In re Riverchase Apartments, L.P.),* 184 B.R. 35, 40 (Bankr.M.D.Tenn.1993).

**24.** *Bucyrus Construction Products, Inc. v. McGregor (In re Ray Brooks Machinery Company, Inc.),* 113 B.R. 56 (Bankr.M.D.Ala. 1989).

**25.** *Id.* at 61.

have on the creditors. The factors articulated in *Pioneer* are not exclusive; the determination of excusable neglect is an equitable one, taking account of all the relevant circumstances.[26] This factor produces some basis for denying Northern's motion. The Creditors' Committee has objected to the motion because allowing Northern's claim at this point would dilute the distribution under the settlement to timely filed unsecured claims. The sale of PPMI's assets resulted only because the Creditors' Committee, EEP and PPMI, notwithstanding severe conflict among them, worked out an agreement that placed $550,000 of EEP's cash collateral into escrow for holders of the allowed unsecured claims. The difficulty experienced in reaching this settlement was evident from the testimony of Christopher J. Ryan, Chairman of the Creditors' Committee. He testified that although the parties had not yet reduced their settlement agreement to writing, they had reached an agreement in principle before Northern appeared in the case. Thus, Northern's claim was not considered in the negotiations leading to the agreement, making agreement more likely than otherwise. Allowing Northern's claim at this point would adversely impact the unsecured creditors who had filed timely claims and relied on receiving 55% on those claims after a difficulty negotiated settlement.

 Another factor courts have considered in determining the existence of excusable neglect is the sophistication of the creditor.[27] Based upon the evidence before the court, the court finds that Northern is a sophisticated creditor. Such a finding weighs against Northern in the court's balancing of the excusable neglect factors.

In sum, the court finds that PPMI satisfied its responsibility by mailing the bar date notice to Northern's address appearing on the checks Enron wrote on Northern's behalf. The court further finds that Northern did not properly arrange its mail-receiving affairs and cannot rely on excusable neglect as justification for failing to file its claim on time. Accordingly, Northern's motion is denied.

IT IS SO ORDERED.[28]

---

**26.** *Pioneer,* at 395, 113 S.Ct. 1489.

**27.** *See In re Alexander's Inc.,* 176 B.R. 715, 722 (Bkrtcy.S.D.N.Y.1995); *In re Figueroa,* 33 B.R. 298, 301 (Bkrtcy.S.D.N.Y.1983).

**28.** The foregoing discussion shall constitute findings of fact and conclusions of law under FED.R.BANKR.P. 7052 and FED.R.CIV.P. 52(a). A judgment reflecting this ruling will be entered on a separate document in compliance with FED.R.BANKR.P. 9021 and FED.R.CIV.P. 58.