**In re Walter RAYBORN, Anna Rayborn, Debtors.**

**No. 98–12083.**

United States Bankruptcy Court, S.D. Alabama.

April 4, 2002.

---

1. *Cousatte v. Lucas (In re Lucas),* 300 B.R. 526 (10th Cir. BAP 2003).

Lacy Robertson, Mobile, AL, for Debtors.

William Howell and Bill Poole, Mobile, AL, for Ford Motor Credit Company.

MARGARET A. MAHONEY, Chief Judge.

This case is before the Court on the motion of Ford Motor Credit Company (FMCC) to reconsider and set aside the Court's January 10, 2002 order reducing and allowing FMCC's Claim No. 10 to $12,968.20 and ordering a $2,337.27 refund to the chapter 13 trustee. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has the authority to enter a final order. For the reasons indicated below, the Court is denying FMCC's motion to reconsider.

FACTS AND PROCEDURAL HISTORY

The debtors, Walter and Anna Rayborn, filed this chapter 13 bankruptcy case on June 15, 1998. Debtors listed a 1995 Ford F250 extended cab pickup with 104,000 miles on it on Schedule B, "Personal Property." The Ford pickup was listed as having value of $8,500 in the column titled

"current market value of debtor's interest in property without deducting any secured claim or exemption." The Ford pickup was claimed as exempt on Schedule C (Property Claimed As Exempt) for $1.00. Again, the truck was listed as having a "current market value" "without deducting exemptions" of $8,500.[1]

FMCC is shown "For Notice Only" in two places on schedule F, "Creditors Holding Unsecured Nonpriority Claims." The first entry shows account number "CAA1659W46" and "Ford Motor Credit Co P O Box 830339, Birmingham, AL 35283–0339." The second entry is immediately below the first and says account number "CAA1659W46" and "Ford Motor Credit Co, P O Box 105332 Atlanta Ga 30348–5332." The amount of the claim in each entry is shown as "0.00."

The debtors filed their plan on June 15, 1998. The plan offers a "preference payment" to FMCC in the amount of $250 per month with a "collateral value" of "$15,000 @ 0%." The plan offers to pay unsecured creditors 0%. The § 341 notice set the first meeting of creditors and confirmation hearing for July 16, 1998 at 1:00 p.m. The deadline to file a proof of claim is shown on the § 341 notice as 10/14/98. The § 341 notice also states, among other things, that a creditor's "failure to file a timely written objection to the debtor's plan and appear on the date and time specified above may result in the plan's confirmation without an evidentiary hearing before the Court and regardless of the effect on any creditor's claim." The § 341 notice further states

any objection to confirmation must be filed by 12:00 p.m. on the date preceding the confirmation hearing date.[2] FMCC, through attorney William Howell, filed an objection to the debtors' plan on July 1, 1998. The plan was confirmed on July 29, 1998 as orally amended. The July 29, 1998 Order Confirming Plan and Payment Order states that Ford Motor Credit is to receive a $367 per month "preference payment" on the 1995 Ford pickup on a "stipulated value" of $22,020.00.[3] Unsecured claims are paid at the rate of 1.17% under this Order.

On November 29, 2001, the chapter 13 trustee filed a motion (the motion is dated November 28, 2001) which states in pertinent part as follows:

> COMES NOW John C. McAleer III, Trustee in this Chapter 13 proceeding, and respectfully moves the Court for the entry of an order allowing Ford Motor Credit's claim for the amount paid as of June 22, 2001 and for the issuance of a refund for disbursements after said date.
>
> The debtor received a paid in full letter dated June 22, 2001. However the Chapter 13 Trustee was not notified and further disbursed $ 1,563.70 on Claim No. 10.
>
> WHEREFORE, the premises considered, the Chapter 13 Trustee respectfully prays that this Court will enter an order reducing and allowing the claim of Ford Motor Credit (Claim No. 10) for $12,968.20 and refund the overpayment of $1,563.70.

---

1. The Summary of Schedules states that the debtors have $134,121 in liabilities from creditors holding secured claims, and that "2" sheets comprising Schedule D were attached to the petition; however, the Court file does not contain Schedule D.

2. The Court file shows that on June 19, 1998 the 341 notice and plan were served on FMCC at the two addresses listed in Schedule F and at "1201 Montlimar Drive Room 700 Mobile AL 36609."

3. FMCC Exhibit 7 introduced at the February 27, 2002 hearing is a copy of the July 29, 1998 confirmation order.

The trustee's motion reflects that FMCC was served with the motion by mail on November 28, 2001 at P.O. Box 55000, Detroit, Michigan, 48255–0953. The genesis of the trustee's motion is a letter which appears in the Court file as having been filed on November 26, 2001 in the trustee's office. The letter dated June 22, 2001 is from Ford Motor Credit Company to debtor Anna Rayborn, 12375 Fernwood Dr. W, Foley, AL 36535–4833, regarding account number KPA 1659W46, and states in part as follows:

Dear ANNA S. RAYBORN

Congratulations! Your account is paid in full.

We appreciate your business and hope to be able to service your financing needs in the future. If you have any questions about your account, please call us at the number listed above.

Thank you for allowing Ford Credit to service your account.

Ford Motor Credit Company

On November 29, 2001, a letter from the debtors dated November 28, 2001 to the U.S. Bankruptcy Court was filed.[4] Debtors state in the letter that FMCC sent the title to the vehicle to them with the above-quoted June 22, 2001 letter and that they received a refund from FMCC for $498 for account overpayments. The letter says that they were told by "Kevin" at "FMCC" that Account No. KPA 1659W46 and CAA 1659W46 are the same accounts, and that the account was paid in full in June 2001 and the title released. In the letter, debtors object to Claim No. 10 and request a refund of $2,337.27 for alleged overpayments to FMCC. The letter does not indicate that FMCC was served with a copy. A hearing was set for January 9, 2002 on the trustee's motion and the debtors' letter.

The notice of the January 9, 2002 hearing has a "Certificate of Mailing" rubber stamp imprinted on the reverse side which was signed 12/3/01 by the Deputy Clerk. This Certificate states that the hearing notice was mailed on December 3, 2001 "to all creditors on the matrix and parties in interest herein as required by the Bankruptcy Code and Rules of Bankruptcy Procedure." The Certificate shows that a total of "4" notices were sent.[5] FMCC is listed on the creditor matrix at three different addresses—the Mobile Montlimar Drive street address and the Birmingham and Atlanta post office box addresses.

A hearing was held on January 9, 2002. Mr. Rayborn and the Rayborns' attorney appeared at the hearing. The chapter 13 trustee also appeared. FMCC did not appear. The trustee's motion was granted as reflected in the Court's January 10, 2002 Memorandum Order as follows: "Trustee's motion for an order reducing and allowing Claim No. 10 of Ford Motor Credit for $ 12,968.20 and refund the overpayment of $1,563.70 to the Chapter 13 Trustee. Motion granted. The Court ordered a refund of $2,337.27. The trustee may withhold from other funds due Ford Motor Credit Company. Funds to be applied to debtors' Chapter 13 case."[6] Attorney William

4. A copy of that letter was admitted as FMCC Exhibit 6 at the February 27, 2002 hearing.

5. In this district in a chapter 13, this means that debtors, their attorney, the chapter 13 trustee, and affected creditor (i.e., FMCC) were served.

6. FMCC Exhibit 6A to the February 27, 2002 hearing is a copy of a payment summary maintained by the trustee's computer system. This document shows disbursements to FMCC through October 16, 2001 totaling $14,531.90. FMCC was sent $773.57 on June 19, 2001, $763.74 on August 22, 2001, $391.19 on September 17, 2001 and $408.77 on October 16, 2001.

Howell was served with the Court's January 10, 2002 order at P.O. Box 9458, Mobile, AL 36691.

On January 22, 2002, FMCC, through counsel William Howell, filed a motion to reconsider and set aside the Court's January 10, 2002 order. FMCC's motion alleges in pertinent part that the June 22, 2001 "paid in full" letter from FMCC to Mrs. Rayborn was a mistake and that in excess of $ 7,000 was still owed on the account. The motion says that "[d]espite William L. Howell, P.A. being the attorney of record for Ford Motor Credit Corporation, William L. Howell, P.A. never received notice of the above referenced January 9, 2002 hearing." FMCC requests reconsideration of the Court's January 10, 2002 order.

On January 24, 2002, a notice setting FMCC's motion to reconsider for hearing on February 27, 2002 was certified by the Deputy Clerk as having been mailed to all creditors on the matrix, etc. Again, the certificate stamped on the reverse side of the hearing notice shows that "4" notices were sent. On January 25, 2002, the Court entered a written order as follows:

This matter is before the Court on Claim No. 10 filed by Ford Motor Credit Company. The Chapter 13 Trustee filed a motion for an order reducing and allowing said claim for $12,968.20 and a refund of $ 1,563.70. On January 10, 2002 the Court ordered a refund of $2,337.27, reflecting an additional disbursement amount. Claim No. 10 will now need to be reduced and allowed to $12,194.63 in order to correct the Trustee's records. It appears that an order should be issued.

It is hereby ORDERED that Claim No. 10, filed in the amount of $ 22,020.00 is REDUCED and ALLOWED for $12,194.63.

The above order was served by mail on January 25, 2002 on attorney William L. Howell at P.O. Box 9458 Mobile, AL 36691.

The debtors filed pro se an objection to FMCC's motion to reconsider on January 30, 2002. The debtors' objection details many of the events above and states in essence that it was FMCC's responsibility to be present or have its legal representative present at the January 9, 2002 hearing and that the Court's prior order should stand. Thereafter, the Court held a hearing on February 27, 2002 on FMCC's motion to reconsider. The testimony and exhibits offered into evidence establish the following additional facts pertinent to the motion before the Court:

Mr. Kevin Havron of Lavonia, Michigan testified by telephone. Mr. Havron is a bankruptcy specialist at Ford Motor Credit's National Bankruptcy Service Center. For many years, FMCC has handled all bankruptcy accounts exclusively through its National Bankruptcy Center. All matters pertaining to FMCC bankruptcy accounts are forwarded to the National Bankruptcy Center. FMCC tracks customer payments and expects to be paid in full. If, for example, a bankruptcy customer has a $ 5,000 balance, but FMCC has an allowed claim of $8,000 in bankruptcy, FMCC expects to receive the full $8,000. Mr. Havron has been at the center for approximately one and one-half years. He is assigned to the Mobile District accounts and is familiar with FMCC's Southern District of Alabama bankruptcy accounts.

FMCC maintains additional customer loan service centers throughout the United States for servicing customers who are not in bankruptcy. For example, there is a loan service center in Tampa, Florida. Once a customer files bankruptcy, the loan service center is supposed to cease moni-

toring the account and has no authority to do anything concerning the account. This procedure is used on all of FMCC's accounts.

Mr. Havron testified that FMCC never received the Trustee's November 28, 2001 motion. According to Mr. Havron, the Detroit, Michigan post office box address shown on the trustee's November 28, 2001 motion is in reality an address for a "lock box" maintained by CoAmerica Bank. This "lock box" is where FMCC receives payments. The sole function of FMCC's arrangement with CoAmerica is to handle payments on FMCC accounts. Mr. Havron believes that FMCC does occasionally receive correspondence concerning FMCC customer accounts at the lock box address. When that happens, CoAmerica forwards it to FMCC. Mr. Havron testified that CoAmerica never forwarded FMCC any correspondence concerning the Rayborns' bankruptcy.

Mr. Havron testified that FMCC "got word" of what had happened on the Trustee's motion concerning reduction of FMCC's claim from its Mobile attorney, William Howell. He says Mr. Howell's office was not notified of the pendency of the trustee's motion.

Mr. Havron testified concerning several exhibits introduced by FMCC. FMCC Exhibit 1 is a copy of the original plan dated June 15, 1998 proposed by the Rayborns. It offers a "preference payment" of $250 per month on a " collateral value" of $15,000. FMCC received the plan and hired William Howell, who filed an objection to the plan for FMCC. A copy of FMCC's objection filed July 1, 1998 was introduced as Exhibit 2.[7] Mr. Havron's tes-

timony and FMCC Exhibit 8 conclusively establish that FMCC did receive the plan.

FMCC Exhibit 3 is a copy of the § 341 meeting bench sheet for the Rayborn case, which is used by the chapter 13 trustee in this district. That sheet and Mr. Havron's testimony reflect that FMCC withdrew its objection to the original plan based on an oral amendment by the debtors which offered FMCC a $367 per month "preference" on a total secured claim of $22,020 (collateral value plus interest).

According to Mr. Havron, FMCC always monitors the chapter 13 trustee's claim payment records to insure that FMCC is getting paid what the trustee is supposed to pay FMCC. FMCC Exhibit 5 is a copy of a computer screen dated 1/16/02 showing various items of information concerning Claim No. 10 of FMCC in the Rayborn bankruptcy. It shows a "claim amount" and "value of collateral" of $22,020; "scheduled amount" of $11,695; "monthly amount" of $367; "principal paid" of $14,531.90; and "principal owed" of $ 7,488.10.

FMCC Exhibit 6C is a copy of the June 22, 2001 letter from FMCC telling Mrs. Rayborn that the account was paid in full. This letter originated in FMCC's Tampa Loan Service Center. It did not come from the National Bankruptcy Service Center, although all departments of FMCC are part of the same company. It was a violation of FMCC policy and an error for this letter to have been sent by Tampa. Once FMCC is notified that an account is in bankruptcy, the National Bankruptcy Service Center is the branch of FMCC with "jurisdiction" to deal with that account to the exclusion of other regular FMCC loan service centers like the one

---

**7.** FMCC Exhibit 8 was introduced at the February 27, 2002 hearing. This exhibit—which appears to have been prepared on June 23, 1998—is a copy of an internal FMCC Bank-

ruptcy Review Report on the Rayborn account. It shows, among other things, that the matter was "assigned to Bill Howell" on June 24, 1998.

located in Tampa. The June 22, 2001 letter was sent by Tampa without authorization of FMCC's National Bankruptcy Service Center. The bankruptcy center would not normally send such a letter unless FMCC's claim in bankruptcy is paid in full.

Regular customer service branches such as the one in Tampa would not normally send a letter such as Exhibit 6C until being informed by the National Bankruptcy Service Center that FMCC's claim in bankruptcy was paid in full. It is FMCC's position in all bankruptcy cases to receive full payment of FMCC's claim. FMCC does not "discount" the claims or allow a smaller amount than the full claim to be paid. The first time that FMCC's bankruptcy center became aware of the mistake letter (i.e., the "paid in full" letter) was when the bankruptcy branch was notified by Mr. Howell's office sometime in January 2002.

Debtor Walter Rayborn testified at the February 27, 2002 hearing. Mr. Rayborn received a certificate of title for the truck with a lien release from FMCC enclosed with FMCC's June 22, 2001 letter to Mrs. Rayborn. Thereafter, in or around September or October of 2001, the Rayborns traded in the truck for a 1989 Chrysler New Yorker at Tim's Auto Sales. Mr. Rayborn testified that the Ford truck was getting only about 10 miles to the gallon and was in bad shape. The Chrysler was in good shape and gets 30 miles to the gallon. The Rayborns received the Chrysler and $1,500 cash. The cash was not turned over to the trustee. They then (in October or November 2001) traded the Chrysler in with the $1,500 cash for a 1994 Lincoln Town Car because the Chrysler was not running very good. The Lincoln was purchased at Ride America in Pensacola. The Rayborns still have the Lincoln, for which they pay $250 a month to Ride America. They are current on their payments to Ride America or maybe a little ahead. The Rayborns did not bring the contracts or other paperwork for the Chrysler and Lincoln transactions to the hearing. The Rayborns still owe around $1,925 on the Lincoln. Mr. Rayborn says that the wholesale value of the Lincoln is $2,000–2,500 and the retail value is $3,500–4,000.

The Rayborns did not obtain bankruptcy court permission to purchase the Chrysler or Lincoln. And, they did not get bankruptcy court permission to sell the Ford truck or to use the $1,500. In fact, no motions asking to sell property and/or incur debt were ever filed. The Rayborns, however, did not know that they needed the Court's approval for these transactions until the trustee's motion seeking a refund was filed.

Mr. Rayborn testified that he contacted FMCC's Tampa office on November 28, 2001. He spoke to a woman named Angela. He does not know her last name, phone number at FMCC, or her position at FMCC. She was aware that he had received title to the truck and told him the account was paid off. Mr. Rayborn also spoke to a man named "Kevin" at 8:30 a.m. the same day. He reached "Kevin" at 1–800–955–8532. He does not know Kevin's last name, his title at FMCC, or his phone extension at FMCC. He told Kevin that he had received the truck title and that the bankruptcy court records still showed money owed on the account. Kevin told Mr. Rayborn that the accounts had been paid off. Mr. Rayborn did keep notes of his conversations with Kevin and Angela. Mr. Havron, who testified by telephone for FMCC, has no record of any conversation with Mr. Rayborn on November 28, 2001, but there is another man who works in the same department at FMCC named Kevin

and that Kevin can be reached at 1–800–955–8532.

Mr. Rayborn also got a refund of $498 from FMCC. He testified that he told "Kevin" that FMCC owed more of a refund due to an alleged overpayment for June. Kevin said the only way FMCC would issue further refunds is a court order directing FMCC to do so. This prompted Mr. Rayborn to contact the chapter 13 trustee, who advised that he write a letter to the trustee. Until Mr. Rayborn had received the title with the lien released from FMCC, he never had any intention of disputing the amount of FMCC's claim.

Mr. Rayborn was aware that FMCC has objected to the original plan. He never agreed to increase FMCC's claim to $22,020. He does not know whether his attorney and FMCC's attorney made an agreement to increase FMCC's claim to $22,020. He left the confirmation hearing thinking FMCC would only get $15,000 with a $250 per month payment. Basically, he knew FMCC wanted more than $15,000 and that Mr. Padgett (his attorney) had initially told FMCC no more would be offered. He told Mr. Padgett to "let him know what y'all [i.e., Padgett and FMCC] do." Rayborn did not think the truck was worth $15,000 at confirmation.

Mr. Rayborn's address in the court file (i.e., 12375 Fernwood Drive West, Foley, Alabama 36535) has not changed since the bankruptcy was filed. He testified that he received copies of orders entered in the case, but that he had not seen the confirmation order. The Court file reflects that the confirmation order was mailed to the debtors.

ISSUES

FMCC argues that it did not get notice of the trustee's November 28, 2001 motion and that if notice had been sent to attorney William Howell's office, it would have "been handled." FMCC says that it made an error in releasing its lien and the title to the Rayborns. FMCC contends that the Rayborns knew that FMCC's secured claim in bankruptcy was $22,020 and likens the Rayborns' conduct to taking money from a checking account that they know that they do not own. FMCC vehemently complains of the Rayborns selling the truck and incurring debt to purchase other vehicles without court permission. FMCC believes debtors' case is subject to dismissal based on their conduct, although no such dismissal motion is before the Court. FMCC says that it is entitled to receive a secured claim of $22, 020 at the "bargained for" preference payment. FMCC wants its secured claim allowed as originally established with a replacement second lien (i.e., behind Ride America) on the 1994 Lincoln Town Car.

Debtors, on the other hand, say that FMCC is now left with an unsecured claim since the title was delivered to debtors by FMCC with FMCC's lien released and the truck was sold. Debtors contend that notice to FMCC's lock box address was sufficient; the person in charge of the "lock box" should have forwarded the mail to FMCC's bankruptcy center for handling. Debtors contend that they, like FMCC, made a "human error" in buying vehicles and selling the truck without court permission and that their conduct does not warrant punishment. Moreover, debtors say that they are not responsible for FMCC's error in releasing FMCC's lien. Debtors say that under the circumstances, FMCC should share pro rata with other unsecured creditors (who will get only 1.17% of their claims under the confirmed plan).

The following issues, then, are presented:

1. Has FMCC shown sufficient "cause" under 11 U.S.C. § 502(j) to warrant re-

consideration of the Court's January 10, *2002* order?

2. Was proper notice given to FMCC of the trustee's November 28, 2001 motion concerning reduction of FMCC's claim?

3. What is the legal effect of FMCC's voluntary lien release and the debtors' subsequent sale of FMCC's collateral?

4. What impact, if any, does the debtors' conduct in selling the truck and buying more vehicles without bankruptcy court permission have on FMCC's position?

5. Assuming that "cause" has been shown for reconsideration of the Court's prior order, what remedy, if any, in terms of FMCC's claim treatment, is appropriate under the circumstances of this case?

■■■ As the party moving for reconsideration, FMCC bears the burden of proving that reconsideration is appropriate. *In re Jones*, 2000 WL 33673759, at *2 (Bankr.M.D.N.C.2000). Specifically, FMCC must show "cause" for reconsideration; otherwise, FMCC's motion to reconsider should not be granted. *Id.* (citations omitted).[8] The Court will address the above issues in discussing whether FMCC has shown "cause" for reconsideration and in discussing the "equities of the case."

**LAW**

■■■ 11 U.S.C. § 502(j) is the starting point. Section 502(j) states in pertinent part that "[a] claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case." Bankruptcy Rule 3008 states that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate." "Section 502(j) and Bankruptcy Rule 3008 grant the bankruptcy court the power to reconsider for cause secured claims that previously have been allowed." *In re International Yacht and Tennis, Inc.*, 922 F.2d 659, 662 (11th Cir.1991). As one court has recognized, however, "[n]either the Bankruptcy Code nor the Bankruptcy Rules define the meaning of 'cause' as used in § 502(j)." *In re Jones*, 2000 WL 33673759, at *2 (Bankr.M.D.N.C.2000); *In re Coffman*, 271 B.R. 492, 498 (Bankr. N.D.Tex.2002).

■■■ Reconsideration under § 502(j) is a two-step process. A court must first decide whether "cause" for reconsideration has been shown. *Jones*, 2000 WL 33673759 *2. Then, the Court decides whether the "equities of the case" dictate allowance or disallowance of the claim. *Id.*; 11 U.S.C. § 502(j). "Bankruptcy courts have substantial discretion in deciding what constitutes 'cause' for reconsider-

---

8. FMCC's motion to reconsider the Court's January 10, 2002 order was filed over 10 days later on January 22, 2002. There is no time limit in Bankruptcy Rule 3008 governing when a motion to reconsider an order allowing or disallowing a claim must be filed. See Fed. R. Bankr.P. 3008. Rule 9023 says that Federal Rule of Civil Procedure 59—which continues a 10–day limit for filing motions to vacate judgments—governs in cases under the Code "except as provided in Rule 3008." The Advisory Committee Notes to Rule 9023 clearly say that Rule 3008 does not contain a 10 day time limit like Federal Rule of Civil Pro-

cedure 59. Moreover, it has been held that a claim may be reconsidered for "cause" even after confirmation. *In re Zieder*, 263 B.R. 114, 117 (Bankr.D.Ariz.2001) (citing *In re International Yacht & Tennis Inc.*, 922 F.2d 659, 662 n. 5 (11th Cir.1991)) (other citation omitted). And, debtors do not argue that FMCC's motion is untimely. Furthermore, assuming Rule 9006(f) applies, FMCC had until January 23 to file the motion even if Rule 3008 did have a 10–day limit, which it does not. Thus, there is no issue concerning the timeliness of FMCC's motion.

ing a claim pursuant to section 502(j)." *Coffman*, 271 B.R. at 498 (citations omitted); *In re Davis*, 237 B.R. 177, 181–82 (M.D.Ala.1999). Although "the 'for cause' standard 'is not standardless,'" *id.* (quoting *In re Davis*, 237 B.R. at 182), there "is considerable variation in the cases concerning the test or standard which should be used." *Jones*, 2000 WL 33673759, at *2.

Some courts look to when the motion to reconsider was filed in order to determine what standards to use to determine "cause." These courts generally say that if the motion is filed within ten days, the motion should be governed by Bankruptcy Rule 9023 and Federal Rule of Civil Procedure 59. See, e.g., *Jones*, 2000 WL 33673759, at *2, n. 1 (citing cases). Other courts hold that where the motion is file outside of ten days, Bankruptcy Rule 9024 and Federal Rule of Civil Procedure 60(b)(1) should govern what is "cause." *Id.* Still other courts "[w]ithout relying solely upon the timing of the motion for reconsideration ... have debated whether the 'for cause' standard under § 502(j) is different from the 'excusable neglect' standard of Rule 60(b)(1) and have reached differing conclusions." *Id.* In addition, some courts focus on how the claim was initially resolved in deciding what standard of "cause" to apply. *Jones*, 2000 WL 33673759, at *2. In Jones, the court held that a party seeking relief from failing to file a timely objection must show "excusable neglect" under the standards announced in *Pioneer Investment Services Co. v. Brunswick Associates*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). *Id.*[9]

The Court need not determine precisely what standard of "cause" to adopt. Why? Because at bottom FMCC's argument on reconsideration is that FMCC did not receive adequate notice of the trustee's November 28, 2001 motion, and if FMCC is correct, it is obvious that "cause" exists for reconsideration under any standard. It is hornbook law that FMCC is entitled to notice and an opportunity to object prior to having its claim altered. Indeed, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted). Surely, FMCC's ground for reconsideration—i.e., that it did not receive notice of the trustee's motion—if proven would constitute "cause" for reconsideration under § 502(j) whether a Rule 60(b) standard, "excusable neglect" standard, or Rule 59 standard were applied. Thus, the court will consider FMCC's alleged "lack of notice" ground for reconsideration without adopting any particular standard for "cause."

The Court's file reflects that the trustee's motion concerning FMCC's claim was mailed by the trustee on November 28, 2001 to FMCC as follows: "Ford Motor Credit P.O. Box 55000 Detroit, MI, 48255–0953 Account No. CAA 1659 W46 KPA 1649 W46." There is no dispute that the foregoing address is a valid, correct address for FMCC. The law is clear that "[w]here mail is properly ad-

---

**9.** The Fifth Circuit has "likened the 'cause' standard found in section 502(j) with the substantive requirements of Bankruptcy Rule 9024 and Rule 60(b) of the Federal Rules of Civil Procedure." *Coffman*, 271 B.R. at 498

(citing *In re Colley*, 814 F.2d 1008, 1010–11 (5th Cir.1987)). The Eleventh Circuit appears to endorse the approach taken by the Fifth Circuit in *Colley*. See *International Yacht & Tennis*, 922 F.2d at 662 (citing *Colley*).

dressed, stamped and deposited in the postal system, there arises a rebuttable presumption that the notice was received by the addressee." *In re STN Enterprises*, 94 B.R. 329, 334 (Bankr.D.Vt.1988) (citations omitted); *In re Longardner & Associates*, 855 F.2d 455, 459 (7th Cir.1988) (citations omitted), cert. denied 489 U.S. 1015, 109 S.Ct. 1130, 103 L.Ed.2d 191 (1989); *Konst v. Florida East Coast Railway Co.*, 71 F.3d 850, 851, 854 (11th Cir. 1996) ("The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee"; citing *Longardner* with approval).[10] FMCC argues that FMCC never received the trustee's motion.

■■■■ A creditor's "denial of receipt alone does not rebut the presumption, but merely creates a question of fact" for resolution by the bankruptcy court. *Longardner*, 855 F.2d at 459 (citations omitted); *STN Enterprises*, 94 B.R. at 334–35 (citations omitted). "The presumption can only be overcome by clear and convincing evidence that the mailing was not, in fact, accomplished." *In re Levoy*, 182 B.R. 827, 834–35 (9th Cir. BAP 1995) (citation omitted). "Where a presumption has been rebutted, the judge must weight the evidence to determine whether the party did, in fact, receive notice." *Robinson*, 228 B.R. at 82 (citations omitted). And, "[a] court may draw an inference of receipt from the fact that the notices were properly mailed." *Id.*

■■■■ There is no question that the address where the trustee's motion was sent is a valid address for FMCC.[11] The testimony of Mr. Kevin Havron was that this Detroit, Michigan post office is a "lock box" maintained by CoAmerica Bank where FMCC receives payments. Mr. Havron admitted that FMCC does receive correspondence/mail at this lock box address concerning FMCC accounts, and that CoAmerica is supposed to forward this information on to FMCC. There was no direct evidence presented, however, that FMCC did not receive the trustee's motion at the lock box; only testimony from Mr. Havron (an employee at FMCC's National Bankruptcy Center for only one and one-half years) that FMCC never received any forwarded mail from CoAmerica about the Rayborn account.[12] Mr. Havron is not in charge of getting FMCC's mail at the "payment" box location. No employee from FMCC or custodian in charge of receiving FMCC's mail at the "lock box" address testified. In short, there was no direct evidence that the trustee's motion did not arrive at the post office lock box, which is a valid address for FMCC. And, there was no evidence concerning any searches conducted by FMCC to determine whether the motion in fact was not received, and no evidence concerning the reliability of CoAmerica's mail handling and forwarding procedures. Accordingly, the Court finds and believes that

---

**10.** It has been held that the Court may rely upon court records as proof of mailing without the testimony of the mailing employee. *Longardner*, 855 F.2d at 459–60; *In re Robinson*, 228 B.R. 75, 81 (Bankr.E.D.N.Y.1998); *In re Ray Brooks Machinery*, 113 B.R. 56, 61 (Bankr.M.D.Ala.1989), aff'd. 113 B.R. 66 (M.D.Ala.1989), aff'd. 898 F.2d 159 (11th Cir. 1990). The Court believes that this rule applies as well to proof of mailing by the chapter 13 trustee's office as reflected by the trustee's certificate of service.

**11.** A copy of the claims register in the Court's file shows Claim No. 10 as Ford Motor Credit Co., Drawer 55–953, P.O. Box 55000, Detroit, Michigan 48255–0953.

**12.** The Court notes that FMCC has a pecuniary interest in denying receipt of the trustee's motion. See *Konst*, 71 F.3d at 855. Under the confirmed plan, unsecured creditors will only receive 1.17% of their claims.

FMCC did in fact receive the trustee's motion.

The fact that the address where the trustee's motion was sent is, according to FMCC, only a location for FMCC to receive customer payments does not alter the Court's finding. From the standpoint of this bankruptcy case, it is FMCC's responsibility to see that important mail received at FMCC's post office boxes and other locations around the nation are appropriately handled by whatever person or entity that maintains FMCC's lock box. That is particularly true where FMCC knows that other mail (i.e., in addition to payments) is frequently received by FMCC at the lock box. Simply stated, notice to FMCC at a "payment" post office box is notice to FMCC. Notice is all that due process requires, not notice to a specific branch or location of a company. There is no requirement in the Constitution, Bankruptcy Code, or Rules which creates a duty on the part of one serving a motion that may adversely affect a creditor to search that creditor's internal structure to locate what branch office or post office box the creditor says is where the notice should be sent. See Fed. R. Bankr.P. 2002 (g); see also *Ray Brooks*, 113 B.R. at 61 ("Receipt ... should not depend on internal handling by employees and whether it [i.e., mail] reaches a certain desk in the company."). As the court recognized in *In re Worthing*:

> Although a creditor may choose to operate its business by dividing its activities into various departments, it may not use that method of operation as a shield against notice properly sent to the creditor in its name and at its place of business.

*In re Worthing*, 24 B.R. 774, 776 (Bankr. D.Conn.1982).

■ FMCC complains that the trustee should have sent the motion to FMCC's attorney, William Howell. It is undisputed, however, that Mr. Howell never filed a notice of appearance and request for notices pursuant to Bankruptcy Rule 9010(b) in the Rayborn case wherein Mr. Howell requested that the Clerk serve FMCC via him with papers filed in the Rayborn bankruptcy. Under these circumstances, the Clerk was under no obligation or duty to serve Mr. Howell with the trustee's motion and/or subsequent hearing notice. Cf. *Alcatel Contracting (NA) v. Slaughter Company & Associates*, 251 B.R. 437, 439 (N.D.Ga.1999) (where law firm filed request for notices and appearance, "Bankruptcy Court had an affirmative duty to send notice of" a bar date to the attorney on behalf of the creditor), aff'd, 219 F.3d 1279 (11th Cir.2000), reh'g and reh'g en banc denied, 234 F.3d 713 (11th Cir.2000), cert. denied, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001); *In re Alton*, 837 F.2d 457, 460 (11th Cir.1988) (creditor not listed on matrix who had actual knowledge of bankruptcy filing was "unknown" to the Bankruptcy Court and was not required to be served with Rule 4007(c) notice; noting generally that clerk's statutory duty is to send notices to all creditors on matrix); see also *Denmon v. Runyon*, 208 B.R. 225, 228 (D.Kan.1997) ("The debtor's obligation is to provide notice to the creditor, not its attorney") and *In re Horton*, 149 B.R. 49, 60 (Bankr.S.D.N.Y.1992) ("[T]he Bankruptcy Code and Rules only require that notice be sent to the creditor, not to a creditor's counsel, even if that counsel is known."). And, the Court has been unable to locate any Bankruptcy Rule or Code provision which would require service of the trustee's motion on counsel for FMCC in this situation.[13]

---

**13.** There are many good reasons for not re- quiring that FMCC's counsel be served. The

For the foregoing reasons, the Court finds and concludes that the notice given complied with procedural due process. Because notice to FMCC was proper and was received by FMCC, FMCC has failed to meet its burden of demonstrating "cause" under § 502(j) for reconsideration of the Court's prior order, regardless of which standard for "cause" (i.e., Rule 59, 60, etc.) is utilized.[14]

Even assuming that FMCC has shown "cause" for reconsideration, which it has not, consideration of the "equities of the case"—see 11 U.S.C. § 502(j)—does not alter the result originally reached by the Court in the Court's prior order. There are several reasons for the Court's conclusion.

First, as a matter of law, FMCC became an unsecured creditor when it released FMCC's lien and the truck was sold. Simply put, there was no longer any collateral to secure the Rayborns' prepetition debt to FMCC once the truck was sold. FMCC is now an unsecured creditor. This situation is somewhat analogous to a postconfirmation plan modification which proposes to voluntarily surrender collateral.

In *In re Zieder*, 263 B.R. 114 (Bankr. D.Ariz.2001), the debtors filed a postconfirmation motion to modify their confirmed plan seeking "to terminate any secured debt payment to Ford [Motor Credit] and to have the balance of Ford's previously secured claim added to its previously allowed unsecured claim to share pro rata with the payments to other unsecured creditors." *Zieder*, 263 B.R. at 116. The Court allowed the modification, holding as follows:

> When these provisions are applied to the facts of this case, they compel the conclusion that Ford's remaining claim must be reconsidered for cause and, when reconsidered, it becomes an unsecured claim by operation of law. There is now no collateral securing Ford's claim. Consequently § 506(a) by its own express terms makes Ford's entire claim an unsecured claim. There is no provision of the Code, and neither Ford nor Nolan suggests there is, that gives a creditor a secured claim without any collateral. Nor do they suggest that the liquidation of the collateral is not ade-

Court will not exhaust all reasons here, but notes that in many instances creditors hire outside counsel to handle limited portions of consumer bankruptcy cases. It is reasonable for the clerk to assume that if an appearance is not filed by an attorney, the attorney is not generally handling all matters on behalf of the creditor that may arise in a bankruptcy. The requirement that an attorney file an appearance before the clerk is obligated to serve the attorney with notices serves, among other things, to keep the court clerk from guessing the scope of counsel's representation, which is a matter strictly between the attorney and affected creditor. It also protects the attorney.

**14.** The Court assumes without deciding for purpose of this holding that FMCC rebutted the evidentiary presumption of receipt of the trustee's motion. Because the Court finds that FMCC did receive the Trustee's motion, there is no need for the Court to determine whether and under what circumstances a creditor can rebut the presumption attendant a proper mailing.

The Court notes that FMCC produced testimony to the effect that if CoAmerica gets correspondence at the lock box it forwards the correspondence to FMCC. Some courts have held that "denial of receipt in combination with evidence of standardized procedures for processing mail can be sufficient to rebut the presumption." *Robinson*, 228 B.R. at 82 (citations omitted). Whether the evidence produced by FMCC is a mere variant of a denial of receipt or would fall within the "standardized" mail procedures exception is not decided by the Court. The Court notes, however, that several courts have rejected similar evidence of "mail handling" as insufficient to rebut the presumption. *Id.* at 83, n. 9.

quate cause for reconsideration pursuant to § 502(j).

*Zieder*, 263 B.R. at 117.

The Court acknowledges that *Zieder* involved a voluntary surrender and not a mistaken lien release and subsequent sale, but believes that *Zieder* is instructive. The salient point of *Zieder* applicable here is that where there is no longer any collateral to secure a debt, the debt is then unsecured. It makes little, if any, difference how the collateral for the debt is extinguished in determining FMCC's claim status. The bottom line is that the Rayborns' debt to FMCC became unsecured after FMCC released the lien and the collateral was sold. See, e.g., Alabama Code § 7–9A–203(b) and Official Comment.[15]

Second, the equities favor the debtors. The evidence concerning the debtors' conduct indicates that the debtors did not act in bad faith or with any evil intention of permanently stripping FMCC of its collateral, lien, and/or secured claim. It is undisputed that FMCC released the title to the debtors and told the debtors that the account was paid in full. This was not in any way the debtors' fault. Mr. Rayborn even telephoned FMCC after receiving the "paid in full" letter (which he was not obligated to do) and Mr. Rayborn was told by two different FMCC representatives that the account was indeed paid off. These conversations served to confirm what the Rayborns were told in the "paid in full" letter. Mr. Rayborn even produced notes of these conversations which serve to corroborate his testimony on this point.

The evidence is also undisputed that the debtors were not aware that they needed bankruptcy court approval to sell the truck and incur new debt to purchase a vehicle. The Court certainly should not be understood as condoning a debtor selling estate property or incurring new debt without prior bankruptcy court permission. The point here, however, is that the evidence shows that the debtors—who are not attorneys-simply made an inadvertent mistake. There is no evidence of bad faith on the part of the debtors such as evidence of intentional concealment of estate property, evidence that the debtors willfully evaded court orders, or evidence of selling valuable estate property to pocket the cash. The debtors used the truck as a trade-in to obtain better but modest transportation, which they obviously needed to effectuate their reorganization. There is no evidence that they incurred enormous debt to acquire a luxurious "high-end" new vehicle. FMCC's argument that debtors' conduct amounts to stealing someone else's money out of a checking account ignores the record.

FMCC is a large institutional lender with so many bankruptcy accounts that it maintains a National Bankruptcy Center. Clearly, FMCC is far more sophisticated in the bankruptcy court process than the debtors. FMCC has known for many years that the Rayborns' account was in bankruptcy, yet FMCC's Tampa loan center sent the Rayborns a "paid in full" letter, and, in violation of FMCC policy, released the title to them.

FMCC maintains many branches and has a lock box post office box where payments are sent. FMCC knows that other mail is sent to this payment box. It is FMCC's responsibility to coordinate branch communication and mail flow, and to arrange its corporate structure such

---

**15.** Thus, even if FMCC had appeared at the January 9 hearing, the result reached by the Court would not have been any different— FMCC was unsecured then and is unsecured now. FMCC's collateral was sold long before the January 9 hearing.

that notices will go to the branch FMCC wants to receive bankruptcy notices. And, it is reasonable to assume that the truck would never have been sold had FMCC not released the title to the Rayborns—through no fault of the Rayborns-in the first instance. Indeed, debtors would not have been able to obtain clear title to the truck had FMCC not released its lien and sent them the title.

This is a close case which presents a rare and unique series of mistakes that converged to create an unfortunate predicament for FMCC. The Court, however, has carefully considered and weighed the equities, and the Court concludes that even if FMCC could show "cause" for reconsideration, the result would not change. This is because FMCC is an unsecured creditor and, on balance, the equities slightly tip in favor of the debtors, although the Court does not condone the debtors' conduct. Consequently, the Court concludes that FMCC is not entitled to an equitable second lien position on the debtors' 1994 Lincoln.

 Under Alabama law, a court may impress property with an equitable lien "where the person against whose interest the lien is declared and enforced is guilty of some wrongdoing." *Jordan v. Mitchell*, 705 So.2d 453, 459 (Ala.Civ.App. 1997) (quoting *Costanza v. Costanza*, 346 So.2d 1133, 1136 (Ala.1977)). The *Costanza* case cited in *Jordan v. Mitchell* appears to be the seminal case on the point of law. *Costanza* defines the "wrongdoing" required to impose an equitable lien as "wrongdoing in procuring the loan or service by which the debt is created." *Costanza*, 346 So.2d at 1136.[16] Most of the reported decisions in Alabama on equitable liens involve real property and/or improvements made on real property. Assuming

that an equitable lien may be impressed on personalty like a vehicle, it is not appropriate here. There is no evidence of any "wrongdoing" by the debtors as defined in *Costanza* and *Jordan* sufficient to give rise to an equitable lien on the Lincoln in favor of FMCC.

For the above reasons, IT IS ORDERED that FMCC's motion to reconsider and set aside the Court's January 10, 2002 order reducing and allowing FMCC's Claim No. 10 to $12,968.20 and ordering a $2,337.27 refund to the trustee is DENIED. FMCC shall refund $2,337.27 to the trustee within 30 days of the date of this Order.

---

**16.** The Eleventh Circuit has cited *Costanza* with approval on another point of law. *Mich-igan Abrasive Co. v. Poole*, 805 F.2d 1001, 1007 n. 5 (11th Cir.1986).